1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
2

3
                                        )
4    UNITED STATES OF AMERICA,          )
                                        )
5            Plaintiff,                 )
                                        )   Criminal Action
6    v.                                 )   No. 1:22-cr-10031-AK-2
                                        )   Pages 1 to 54
7    JOSE MARTINEZ,                      )
                                        )
8            Defendant.                 )
                                        )
9

10

11               BEFORE THE HONORABLE ANGEL KELLEY
                   UNITED STATES DISTRICT JUDGE
12

13                           SENTENCING

14

15                         May 16, 2024
                           12:05 p.m.
16

17          John J. Moakley United States Courthouse
                       Courtroom No. 8
18                    One Courthouse Way
                 Boston, Massachusetts 02210
19

20

21

22               Linda Walsh, RPR, CRR
                   Official Court Reporter
23       John J. Moakley United States Courthouse
                     One Courthouse Way
24               Boston, Massachusetts 02210
                    lwalshsteno@gmail.com
25

1    APPEARANCES:

2    On Behalf of the Government:

3         UNITED STATES ATTORNEY'S OFFICE
          By: AUSA Katherine H. Ferguson
4         1 Courthouse Way, Suite 9200
          Boston, Massachusetts 02210
5         617-748-3555
          katherine.ferguson@usdoj.gov

6

7    On Behalf of the Defendant:

8         HOGAN LOVELLS US LLP
          By: Anthony E. Fuller, Esq.
9             Gregory F. Noonan, Esq.
          125 High Street
10        Boston, Massachusetts 02110
          617-371-1032
11        anthony.fuller@hoganlovells.com
          gregory.noonan@hoganlovells.com

12

13

14

15

16

17

18

19

20

21

22              Proceedings reported and produced
               by computer-aided stenography.
23

24

25

<pre>
                        P R O C E E D I N G S
</pre>

          THE CLERK:  All rise.

          THE COURT:  You may be seated.

          THE CLERK:  Please be seated.

12:05     THE COURT:  We're back on the record, and the
appearances remain the same.

          Let's get Probation's appearance, please.

          U.S. PROBATION:  Good morning, Your Honor.  Martha
Victoria on behalf of U.S. Probation.

12:05     THE COURT:  Thank you.  Thank you for making yourself
available.  I'm not sure that we're actually going to achieve
what we ambitiously thought we might, but thank you for coming.

          All right.  So who should be heard first on this?

          MR. FULLER:  Your Honor, what issue are you speaking
12:06 of?

          THE COURT:  Well, the first issue -- how would you
like to proceed, Counsel?  Let's start there.

          MR. FULLER:  Well, Your Honor, I think once the
guidelines have been resolved and I think with our withdrawn
12:06 objections --

          THE COURT:  So we have to resolve the guidelines?

          MR. FULLER:  Correct.  Right, and then the career
offender, and then I think we would argue on the sentence is
how I would think, but I defer to Ms. Ferguson.

12:06     THE COURT:  That sounds right to me.  So let's deal

1    with the career offender issue and the guidelines in order to

2    calculate the guidelines.

3           MR. NOONAN:  Your Honor, if you think additional

4    argument beyond our previous hearing and the papers would be

12:06  5    helpful to you, I am more than happy to --

6           THE COURT:  Yes.  Go for it.  Walk me through it.

7           MR. NOONAN:  As we discussed last time, we're setting

8    aside -- we rest on the papers when it comes to the trafficking

9    issue, and we are essentially arguing the controlled substance

12:07 10    issue and whether or not the federal controlled substances,

11    i.e., you know, the schedules, the federal schedules of

12    controlled substances, whether that is the guidepost on which

13    to determine whether or not the drugs in this case are

14    controlled substances for the purposes of a career offender

12:07 15    enhancement.

16           I think Ms. Ferguson will agree that the issue that

17    this Court needs to determine today is whether or not the Court

18    should look to the federal schedule in making that

19    determination, and if one were to do that, you would look at

12:07 20    the federal schedule and say what is cocaine on the federal

21    schedule and then compare it to how cocaine is defined in the

22    state of Massachusetts.  And that is the way that the Second

23    Circuit, the Fifth Circuit, and the Ninth Circuit have gone,

24    and that is the way that Judges Hillman and Wolf in this

12:07 25    district have gone.

                The government will argue that the other way to go is

        to look at simply is this a state law that, you know, controls

        the distribution or the trafficking of drugs and just look at

        the state law and do not compare it to the Federal Controlled

12:08   Substances Act and its schedules.

                THE COURT:  Now, are you making that argument because

        you're relying on Judge Wolf's analysis when it pertained to

        the Armed Career Criminal Act?

                MR. NOONAN:  I'm making that argument in part based on

12:08   Judge Wolf's analysis but also based on the analyses in the

        Second Circuit, the Fifth Circuit, and the Ninth Circuit, as

        well as the dicta in the First Circuit's *Crocco* case in which

        the First Circuit said -- and the First Circuit has not decided

        this issue.  We concede the First Circuit has not decided this

12:08   issue.

                But the First Circuit said that there's two ways of

        looking at it.  And one way is to look at the federal schedule

        and say is the federal schedule identical or is it broader than

        the state schedule, or the other way to go is to look at the

12:09   state and say is this a banned substance in the state.

                And the First Circuit in dicta said that that second

        way, which is the way the government urges the Court to go, is

        fraught with peril.  It has not decided the issue, but it

        indicated it was fraught with peril.  And I would argue that

12:09   the reason why the First Circuit has made that comment in dicta

1    is because the federal sentencing guidelines exist to promote

2    and try to achieve uniformity, and they also are the federal

3    sentencing guidelines and they deal with federal crimes.

4            And if you're going to have inconsistency, it seems

12:09  5    like the inconsistency should favor going with the federal

6    standards as opposed to the state standards, and one of the

7    reasons for that, Your Honor, is you can imagine a world in

8    which the federal government in 49 out of 50 states all agree

9    on, say, you know, cocaine being a banned substance, and one

12:10  10   state -- Sorry.  Let me reverse that.

11           You can imagine a situation in which a drug is

12    legalized, like marijuana, for example, both on the federal

13    level and in many states.  So imagine a world in which it's

14    legalized in every state but one or two, and you could have a

12:10  15   situation that if the First Circuit and this Court go with the

16    state analysis versus the federal analysis, you could have a

17    situation a few years from now where people who are convicted

18    of state marijuana crimes get the career offender enhancement

19    even though, you know, the trafficking or distribution of

12:10  20   marijuana may no longer even be a federal offense or an offense

21    in 48 states.

22           We concede that there's going to be inconsistencies.

23    Things are going to fall through the cracks regardless.  But

24    traditionally there's presumptions that the federal sentencing

12:10  25   guidelines are referring to federal standards when they discuss

their own guidelines.  And there is the Jerome presumption in
which Congress, unless it explicitly states otherwise, does not
expect its laws to be dependent on the interpretation of state
laws.

12:11    And Ms. Ferguson will likely argue that the beginning
of the definition of the career offender enhancement talks
about federal or state laws, and we concede that as well.  But
we would say that that's there just to make it possible that
having prior state law convictions can be a predicate for the
12:11 career offender enhancement, not to say that state-only
controlled substances count as a controlled substance for that
predicate.

        THE COURT:  Okay.

        MR. NOONAN:  Thank you, Your Honor.

12:11        MS. FERGUSON:  Your Honor, it's the government's
position that the Court should join the majority of the
circuits and the majority of the judges from this district and
adopt the position that the career offender provision by its
plain text states that a controlled substances offense is one
12:12 that is criminalized under either federal law or state law.

        THE COURT:  That seems pretty clear to me.

        MS. FERGUSON:  It is the plain language that is set
forth in the guideline itself.  It is what --

        THE COURT:  But counsel seems to be asking me to split
12:12 a hair a different way.

1          MS. FERGUSON:  It is the government's position, Your

2     Honor, and it is the position that has been adopted now by one

3     more circuit, now the Eleventh Circuit has within the last

4     couple of weeks joined the Third, Fourth, Sixth, Seventh,

12:12 5     Eighth, and Tenth Circuits now, all to have said the guidelines

6     mean what the guidelines say, which is that an offense under

7     federal law or state law counts as a predicate offense.  A drug

8     offense that meets the criteria set forth under federal or

9     state law qualifies --

12:13 10          THE COURT:  So does it require at all determining the

11     definitions of any of these terms, controlled substance offense

12     or any of the means in which that offense could be committed?

13     So I'm looking at 4B1.2.  So do I need to look at this or not?

14     And I was referring to the guidelines.

12:13 15          MS. FERGUSON:  You were referring to?

16          THE COURT:  To the guidelines.

17          MS. FERGUSON:  Well, there are certain criteria that

18     are set forth in 4B1.2, and there are certain courts that have

19     looked to what is -- what is a controlled substance.  There are

12:13 20     certain courts that have looked at definitions of what

21     controlled -- what a controlled substance is.

22          THE COURT:  So do I need to analyze *Bain* and the other

23     case that starts with an A, *Abdulaziz* or something like that,

24     *Abdulaziz*?

12:14 25          MS. FERGUSON:  *Abdulaziz*.

1          THE COURT:  Yes.

2          MS. FERGUSON:  So -- well, we have -- with respect to

3    *Bain* and *Abdulaziz*, those pertain to the trafficking issue, and

4    I believe that --

12:14  5          THE COURT:  Isn't that what they're challenging?

6          MR. NOONAN:  Well, Your Honor, *Abdulaziz*, Judge Wolf,

7    when reaching this very issue, actually was interpreting

8    *Abdulaziz* because *Abdulaziz* does deal with the categorical

9    approach.  In *Abdulaziz*, the government attempted to raise at

12:15 10   the appellate level the issue that we're discussing right now.

11         In the footnote, the First Circuit said that this very

12   argument that we are having right now was raised untimely.

13         MS. FERGUSON:  *Abdulaziz* was decided on waiver

14   grounds.  So this issue was not decided in Abdulaziz.

12:15 15         MR. NOONAN:  Completely agree, Your Honor.

16         THE COURT:  Hold on one second.  I'll give you a

17   chance.  Let me just find his criminal history.

18         So I'm looking at pages 25 and 26 of the PSR, and that

19   identifies the two prior convictions, the predicates for it,

12:16 20   right?

21         MR. NOONAN:  Yes, Your Honor.

22         THE COURT:  All right.  And so the one that you're

23   challenging is on page 25, paragraph 79, the trafficking?  Is

24   that the issue or is it 80?

12:16 25         MS. FERGUSON:  I think they were challenging on both

1   grounds, the ioflupane and the trafficking.  And I believe

2   Mr. Noonan was resting on the papers with respect to

3   trafficking and arguing about the ioflupane.  I'm happy to --

4          MR. NOONAN:  That is completely correct.  We are

12:16 5   resting on the papers on the divisibility of the trafficking

6   statute, and we are arguing that -- and I believe -- I mean,

7   the categorical approach matters for both of these convictions.

8          THE COURT:  Do you agree on that?  Is it a categorical

9   approach or is it a modified?

12:16 10         MS. FERGUSON:  Well, so I think with respect to the

11  ioflupane issue, I think -- I don't know.  Technically I think

12  people phrase it differently.  Some people would say you don't

13  have to even reach the categorical approach issue because just

14  by the plain text it says federal or state applies, and so you

12:17 15  don't really even have to get into whether the definition of

16  the crime matches because it's federal or state.  And so you

17  just look at whether it's a crime under state law, and if it

18  is, then if it meets the other criteria, it works as a

19  predicate.  So some people would say you don't have to get into

12:17 20  the categorical approach.  I think it's a little bit a matter

21  of semantics.

22          With respect to the trafficking issue, I think the

23  First Circuit has been clear in *Bain* saying that the First

24  Circuit finds the Massachusetts authorities to be equivocal as

12:17 25  to whether the statute is divisible or not and so said that you

should then take a modified categorical approach and look at

the Shepard documents.  I think in this case the Shepard

documents make completely clear that he was not convicted of

bringing into the Commonwealth form of trafficking, and so I

think that the trafficking issue goes away, so to speak, and

the predicate counts with respect to the trafficking.

          Does that answer your question?

          THE COURT:  Maybe.

          MS. FERGUSON:  Maybe, okay.  Well, so I think -- so

the categorical approach is certainly relevant to the

trafficking question.  I think that the First Circuit has said

that you need to go to a modified categorical approach because

it finds the Massachusetts authorities to be equivocal.  I did

point in my papers to a case that the defense also brought to

your attention that I believe postdates *Bain* that I believe

supports our position, if it were to be a categorical -- you

know, on the categorical approach suggesting that it is in fact

divisible, and if it is divisible, then, again, the Shepard

documents show that he was not convicted of the bringing into

the Commonwealth form of trafficking, so then, again, the

predicate would survive and would qualify as a career offender

predicate via that approach as well.

          MR. NOONAN:  Maybe, if this would be helpful, Your

Honor, it can be -- this is always very -- this is -- the

categorical approach and the modified categorical is confusing

1       for everyone no matter how long they've been doing this.  I

2       think one of the reasons is because the categorical approach,

3       you can take a categorical approach both to, like, what the

4       controlled substance is, because that's an element of the

12:19  5   crime, or to, like, ways of achieving the crime.

6               So the trafficking -- we're resting our papers on the

7       trafficking.  But the trafficking issue, it's whether or not

8       the Massachusetts statute, you know, jibes with the federal

9       statute about how to distribute, manufacture, import, like, the

12:20 10   drug.

11              But the argument that we're making today is also

12      categorical but it's about what the drug itself is.  So it's a

13      categorical approach in either situation.

14              I take Ms. Ferguson's point that should this Court

12:20 15   agree with the foreign jurisdictions about how to deal with the

16      federal versus state controlled substance definition, then in

17      that instance when the only question at play is what is the

18      drug, then it may in fact -- if you were to go Ms. Ferguson's

19      way, that may in fact not be a categorical question because you

12:20 20   would just be looking at the state law.  But we would say

21      that's putting the cart before the horse because we're asking

22      you to look at the federal drug schedule and sort of keep in

23      line with *Abdulaziz*, Judge Wolf's decision, Judge Hillman's

24      decision that we do take the categorical approach.

12:21 25              We concede that the First Circuit has not ruled on

which way this Court should go in terms of applying the federal

standard versus, like, the state standard in what the drug is.

We don't agree that the plain language of the career offender

enhancement is so plain.  We think that if the federal

sentencing guidelines wanted to make it so obvious that a state

definition of a drug would be enough, then they would list

after dispensing a controlled substance or possession of

controlled substance under federal or state law.

We don't think that the first clause, federal or state

law, modifies controlled substance.  We think that if the

federal sentencing guidelines want to modify controlled

substance with either federal or state controlled substance, as

opposed to just federal controlled substance, they could have

and would have said it right there.  And absent that

indication, we think applying the federal standard or the

federal schedule just seems to be the most commonsense way in

keeping with the Jerome presumption and the presumption that

you look towards federal standards to interpret federal

sentencing guidelines for uniformity's sake; that just seems to

be the cleanest way of doing it.

And we think, one, the court in *Abdulaziz* certainly

could have taken the late argument from the government if it

wished to and dealt with it then, but they chose not to.  And,

two, in *Crocco* the dicta seems to indicate that the path that

Ms. Ferguson is urging upon the Court is fraught with peril.

1    We concede that those are not controlling, but we think they

2    are indications from the First Circuit that if it wanted to

3    make it clear that state law controls, they could have said

4    something that's not fraught with peril.  Fraught with peril

12:22  5    seems to be a big red light and not a green light.

6              THE COURT:  I guess they'll educate us at some point

7    in time.

8              MR. NOONAN:  One can only hope.

9              THE COURT:  Okay.  Did you want to add anything?

12:23 10             MS. FERGUSON:  Well, I would just -- I would urge the

11    Court not to make a decision based on dicta in a First Circuit

12    case that did not -- that explicitly stated it was not deciding

13    the question which was not before the Court and to not make a

14    decision based on the fact that the First Circuit did not

12:23 15    decide a question that it said was waived.  Those are certainly

16    not decisions on an issue.  In fact, they are explicit

17    declinations to decide an issue.  So that, I think, is not an

18    indication of how the Court should decide the question.

19             Instead, I would urge the Court to look at the

12:23 20    language of the guideline itself and look at the reasoning from

21    other courts, the myriad of other circuits that have in fact

22    gone in the direction that the government is urging this Court

23    to take and have pointed out also that in fact the guideline

24    did previously cross-reference to the federal schedule and

12:24 25    ultimately deleted that cross-reference that --

1        THE COURT:  Which version was that?

2        MS. FERGUSON:  That was previously several years ago,

3   as indicated in footnote 9 of the government's original

4   sentencing memorandum on page 19.  As was discussed in the

12:24  5   concurrence in *Chaires*, 4B1.2(b) originally was defined based

6   on federal law and contained an explicit reference to various

7   provisions of the Federal Controlled Substances Act, but two

8   years later the commission deleted those cross-references and

9   left instead 4B1.2(b) as defining controlled substance offense

12:25 10   in reference to federal or state law.

11        And that, also, there are other portions of the

12   guidelines, and where it is explicitly stated that definitions

13   of serious drug offense are not coextensive with the definition

14   in 4B1 point -- 4B1.1 in the career offender provision and that

12:25 15   those other provisions are keyed to the federal controlled

16   substances definition, and so that's also noteworthy, that

17   there is an explicit statement that they are not coextensive

18   and the other one is keyed to the federal controlled substances

19   definition.

12:25 20        THE COURT:  So the defendant relies on Judge Wolf and

21   Judge Hillman.  But have Judges Stearns, Casper and Saris --

22        MS. FERGUSON:  Saris.

23        THE COURT:  -- followed the approach that you are

24   recommending?

12:26 25        MS. FERGUSON:  Yes.  And Judge Wolf, of course, as I

1    noted in my papers, his opinion is not with respect to the

2    career offender provision.  That is a different context.

3              THE COURT:  It's the Armed Career Criminal Act, right?

4              MS. FERGUSON:  Yes.

12:26 5          THE COURT:  And Hillman, what about Hillman?

6              MS. FERGUSON:  Judge Hillman, it was a career offender

7    decision.  However, the transcript does not -- he does not

8    explain -- he does not provide a very fulsome explanation as to

9    the reason for his decision.  Judges Casper, Stearns, and Saris

12:26 10   provide more of a fulsome explanation for -- of the reasoning

11   for their decisions.

12             THE COURT:  That seems to be where I should land,

13   Counsel.  But help me understand, are there some broader

14   ramifications or implications that I'm not appreciating at this

12:27 15   point by concluding that he's a career criminal -- excuse me --

16   a career offender?

17             MR. NOONAN:  In this particular instance --

18             THE COURT:  I know ultimately it changes the

19   guidelines, but aside from that, am I missing something?

12:27 20             MR. NOONAN:  I believe it will sweep in more people

21   for enhance -- it will sweep in more people for enhanced

22   criminal sentences.  More people will face the drastically

23   high -- the drastically high guidelines of a career offender

24   should one take 50 states' definitions of controlled substances

12:27 25   plus the federal definition of controlled substances.  I

1    believe that's a real world likely consequence.

2         And I agree with Ms. Ferguson certainly on one thing,

3    there is no controlling law in this district or this circuit

4    that dictates what this Court can do in this instance.  So we

12:28 5    would simply urge this Court to do whatever it thinks is the

6    most reasonable way of handling this question.

7         THE COURT:  All right.  For Mr. Martinez, are there

8    some greater ramifications that I'm not appreciating at this

9    point?

12:28 10         MR. NOONAN:  The increased guidelines and the greater

11   exposure.

12        THE COURT:  Which we sort of touched on already.

13        MR. NOONAN:  We did, Your Honor.

14        THE COURT:  All right.  I think that the guideline

12:28 15   4B1.2 is clear.  It says under federal, state law.  It's clear

16   to me that Judge Wolf was talking about the Armed Career

17   Criminal Act, and so I don't see why I should deviate from

18   that, which then lands me to finding that he's a career

19   offender because he has the two prior drug convictions for

12:29 20   controlled substances.

21        But let me just check in with Probation to find out,

22   you know, if there's anything else to be added to this

23   discussion.  And just because I turn to you, don't feel like

24   you have to say anything but....

12:29 25        U.S. PROBATION:  No, Your Honor, I don't believe

1    there's anything to add.  We stand by the presentence report.

2    We maintain that he's correctly classified as a career

3    offender, and we would adopt the arguments that the

4    government's making in support of that.  That's how our office

12:29 5    is applying the guidelines and that's how we think we've seen

6    the judges in this circuit interpret them aside from the two

7    other cases mentioned with Judge Wolf and Judge Hillman.

8        So Your Honor, in summary, there's nothing else

9    additional I think that you need to consider.

12:29 10        THE COURT:  All right.  So turning back to you,

11    Attorney Fuller, you identified -- I'm sorry?

12        MS. FERGUSON:  Oh, I'm sorry.  I just -- I think with

13    respect to the career offender, just so the record is clear, I

14    think just the -- there were two separate issues.  I think it

12:30 15    sounded like you were just speaking to the ioflupane issue,

16    which was the definition of the controlled substances, but I

17    think, also, we did have the trafficking issue, which was sort

18    of separate -- related but separate in terms of the predicate,

19    whether the trafficking predicate qualifies as a predicate.

12:30 20        THE COURT:  Is that because of the importing?

21        MS. FERGUSON:  Yes.

22        THE COURT:  Okay.  So let me hear you on it.  I don't

23    see the issue, but go ahead.

24        MS. FERGUSON:  Do you want me to -- okay.

12:30 25        MR. NOONAN:  I mean, I think all Ms. Ferguson is

```
 1    saying is that she wants you to officially rule on the record
 2    that this Court finds that --
 3              THE COURT:  Both offenses.
 4              MR. NOONAN:  -- that both offenses --
 5              THE COURT:  Are predicate.
 6              MS. FERGUSON:  Sorry.
 7              MR. NOONAN:  Is that what you are asking?
 8              MS. FERGUSON:  I just think we just need on the
 9    record --
10              THE COURT:  That the trafficking offense -- let me
11    turn back to it.
12              MR. NOONAN:  Very briefly, Your Honor, we agree that
13    the documents that Ms. Ferguson located and submitted, should
14    this Court take a modified categorical approach to the
15    Massachusetts statute, would support a modified categorical
16    analysis.  Our papers argue that the statute itself is not
17    divisible.  Ms. Ferguson has pointed out that there is -- you
18    know, the circuit has basically indicated that it's the
19    Massachusetts state courts have been equivocal as to whether it
20    is or is not divisible.
21              So again, much like the last issue, this Court is in a
22    position where it can do what it wants in terms of determining
23    whether or not the trafficking -- whether the trafficking meets
24    the modified categorical analysis.  Is that fair, Ms. Ferguson?
25              MS. FERGUSON:  Well --
```

1          THE COURT:  Is it a modified approach or is it a

2    categorical approach on the trafficking?

3          MS. FERGUSON:  Well, so I think the First Circuit in

4    *Bain* said that at the time --

12:32  5          THE COURT:  I'm sorry.  Let me just jump in for a

6    second.  Let me correct myself.  So the modified categorical

7    approach allows me then to look at the documents.

8          MS. FERGUSON:  Yes.

9          THE COURT:  Okay.  Go ahead.  What were you going to

12:32 10    say?

11          MS. FERGUSON:  I was going to say that the First

12    Circuit said in *Bain* that at the time the First Circuit decided

13    *Bain*, the Massachusetts authorities were equivocal, and so the

14    best approach was to look at the documents.  I think if the

12:32 15    Court does that, the documents here are clear.  I think the

16    only authorities that I saw that sort of postdated *Bain*, if

17    anything, I think support divisibility as opposed to

18    indivisibility, so I think either way the predicate would

19    qualify.

12:33 20          THE COURT:  All right.

21          MS. FERGUSON:  That's my position.

22          THE COURT:  All right.  Thank you.  So the -- page 25,

23    paragraph 79 that identifies the trafficking and cocaine

24    conviction in the Essex Superior Court, I find that that is a

12:33 25    valid predicate.  And on page 26, paragraph 80, the

1    distribution of a Class B drug out of the Lawrence District

2    Court is also a predicate for career offender.  Satisfied?

3              MR. NOONAN:  We understand, Your Honor.

4              MS. FERGUSON:  Yes.

12:33  5              THE COURT:  All right.  I don't know if I need to make

6    any clearer the record.

7              MR. NOONAN:  No.

8              THE COURT:  All right.  You'll do whatever you feel is

9    necessary to do, but if there is something else I need to

12:33 10    review, let me know.

11              All right.  So now let me turn to -- I am now turning

12    to page 23 where the PSR -- oh, I'm sorry.

13              I think I was turning to you, Attorney Fuller.  So you

14    said first I had to address the career offender.  Then there

12:34 15    was another part, number 2, and that's --

16              MR. FULLER:  I think the only other thing, Your Honor,

17    before we get to argument, is to resolve any objections that

18    affect the guidelines sentence analysis.  And I don't think --

19    since we've waived the objections to the weight and the gun

12:34 20    enhancement, I don't believe there are any that need to be

21    resolved that would affect the sentence.

22              THE COURT:  All right.  And so in reviewing the --

23    actually, starting on page 22, the Probation Department

24    identifies that the base offense level is 30 based upon at

12:34 25    least 1,000 kilograms but not less than 3,000 kilograms of

```
 1   converted drug weight; adds plus two for the firearm, for an
 2   adjusted level of 32, right?  But then for the career offender,
 3   that is an offense level of 34 that we have to jump to -- and
 4   stop me if I'm wrong at any point in time -- and then it's
 5   minus three for a timely acceptance of responsibility, giving a
 6   total offense level of 31.  Did I state that correctly,
 7   Probation Officer?
 8             U.S. PROBATION:  Yes, Your Honor.
 9             THE COURT:  All right.  Government?
10             MS. FERGUSON:  Yes.
11             THE COURT:  That's the position that you've taken.
12   You have no objections to my calculations on that?
13             MS. FERGUSON:  Correct.
14             THE COURT:  All right.  Defense counsel?
15             MR. FULLER:  Your Honor, you calculated it correctly.
16             THE COURT:  All right.  And I know you've reserved --
17             MR. FULLER:  Thanks.
18             THE COURT:  -- whatever, note your objections to my
19   determination of the career offender status being applicable.
20   All right.  So we've got the guideline sentence.
21             What's next, Attorney Fuller?
22             MR. FULLER:  Well, I think it's the government's turn
23   to argue what sentence you should give and then we get to go.
24             THE COURT:  All right.  Let me just make sure there's
25   nothing else that I need to cover with you before we get to
```

1    that.

2            Probation is standing so I think that means we're

3    omitting something.

4            U.S. PROBATION:  Just to state for the record, because

12:36 5    you found he is a career offender, the total offense level is

6    31.  That brings up his Criminal History Category to VI.  So

7    his total offense level is 31 and Criminal History Category VI.

8    The advisory guideline range is 188 to 235 months, just to

9    state that on the record.

12:36 10            THE COURT:  Thank you.  Yes, which is ridiculous in

11    this case, all right?  So let's move on.

12            Oh, I think I was double-checking something.  I think

13    we are at that point where I hear from the government on your

14    recommendation.

12:37 15            MS. FERGUSON:  Thank you.

16            THE COURT:  And Mr. Martinez, just so you know, I am

17    going to hear from the government, I'll hear from your lawyers,

18    and I'll give you an opportunity to speak.  I know you did

19    submit something, and hopefully your attorneys will incorporate

12:37 20    that into their argument.

21            Go ahead, Counsel, AUSA Ferguson.

22            MS. FERGUSON:  Thank you.

23            The government's recommendation is as set forth in my

24    papers, and that is a recommendation of 141 months in custody

12:37 25    to be followed by four years of supervised release.  This is a

1  recommendation that is a variance from the career offender

2  guideline as just calculated by the Court and stated on the

3  record by Probation.  It's approximately a 25 percent variance

4  below the low end of the career offender guideline.

12:38  5       THE COURT:  Tell me why I should go below the

6  guidelines.

7       MS. FERGUSON:  I am happy to do that, Your Honor.  It

8  is a recommendation that is within -- or just above the

9  so-called natural guideline as calculated by the Court here

12:38 10  today, and as we discussed earlier today, at the guideline

11  level calculated by the Court and at Mr. Martinez's so-called

12  natural criminal history his guideline range would be 108 to

13  135 months.

14       THE COURT:  So it would be above that.

12:38 15       MS. FERGUSON:  It's just above.

16       THE COURT:  An upward variance.

17       MS. FERGUSON:  Just above the natural -- so-called

18  natural guideline range.

19       THE COURT:  And I think -- let me just see.  141

12:38 20  months.  I know I took a note of what I determined that is in

21  years.  Almost 12 years.  All right.  Go ahead.

22       MS. FERGUSON:  Yeah, 11 and three quarter years.

23       THE COURT:  And Mr. Martinez is 29 years old, okay.

24  Go ahead.

12:39 25       MS. FERGUSON:  The government's recommendation is

based on several factors.  Mr. Martinez is not really
comparable to anyone who's been sentenced thus far in this
case.  This is obviously a large conspiracy that's been
charged, quite a large number of defendants charged in this
case, and a fairly significant number have been sentenced
already now before the Court.

THE COURT:  Do you have any chart of all of the
defendants who have been sentenced and what their either
circumstances are or, you know, criminal history categories or
amount of drugs that were attributed to them?

MS. FERGUSON:  I'm sorry.  I missed the beginning of
the question.

THE COURT:  Do you have any chart?

MS. FERGUSON:  Do I have a chart?

THE COURT:  Yes.  How are you keeping track of it?
Because I'm trying to keep track of it.  But how are you
keeping track of it?

MS. FERGUSON:  Well, I know -- I guess I have lived
with the case for many years so I just sort of know it, I
guess, implicitly.  But --

THE COURT:  It would be helpful in the future --

MS. FERGUSON:  Okay.

THE COURT:  -- for me to be able to visualize it.  I'm
trying to keep up as quickly as these are coming to have my own
chart, but to the extent that we are going to refer to other

1    defendants, which I think is important to do in this case, to

2    have that available.

3         MS. FERGUSON:  Okay.  Duly noted, Your Honor.  I will

4    prepare one of those.

12:40  5         Mr. Martinez is one of the higher level participants

6    in this conspiracy.  He, together with his brothers, was flying

7    to Puerto Rico.  They were purchasing wholesale quantities of

8    cocaine in Puerto Rico.  They were mailing that cocaine back to

9    the mainland United States, here to New England, and they were

12:41 10   distributing that cocaine when it arrived back here in

11    Massachusetts and surrounding areas.  They were distributing

12    retail quantities of cocaine here.  They were cooking some of

13    the cocaine into crack cocaine.  That's clear from the

14    intercepted calls.  They were distributing -- they were

12:41 15   reselling wholesale quantities of cocaine here.  They had a

16    robust redistribution business here centered in and around

17    Lawrence, Massachusetts.

18         THE COURT:  And it's your position that it's the

19    brothers and mothers -- and mother that are responsible for

12:41 20   this large conspiracy and all its tentacles?

21         MS. FERGUSON:  I would say that -- I would say that

22    Joseph Correa is the head --

23         THE COURT:  The mastermind.

24         MS. FERGUSON:  Sure, the mastermind.  And I think that

12:42 25   Jose Martinez is one of the top people with Mr. Correa.

1          THE COURT:  Okay.

2          MS. FERGUSON:  I don't think he's exactly a partner

3    with Mr. Correa, but I think he is one of the highest level

4    actors with Mr. Correa.  And I think that Luis Martinez is

12:42  5    somewhat less culpable but also was flying to Puerto Rico at

6    times also himself.

7          THE COURT:  Thank you.

8          MS. FERGUSON:  But Mr. Martinez, who is here before

9    the Court today, certainly was flying to Puerto Rico, also.  He

12:42 10   did not go as frequently as Mr. Correa but he did go.  It

11   wasn't a one-time thing, it wasn't a two-time thing.  He was

12   going with Mr. Correa.  They were buying cocaine together, and

13   they were together mailing the drugs back here.  Mr. Martinez

14   was tracking packages, he was in contact with people here who

12:43 15   were receiving some of the packages, he was sometimes receiving

16   packages to his own residence.

17          A package going to his residence was seized at the

18   beginning or nearer to the beginning of the investigation.

19   That package contained a kilogram of cocaine.  Later in the

12:43 20   investigation, closer to the end of the investigation, a

21   package intended for Mr. Martinez was seized.  That contained

22   half a kilogram of cocaine.  He went to the post office to try

23   to retrieve that package, and there were other packages in

24   between, as I said, that he was tracking, that he was

12:43 25   intercepted discussing, that, also, it's the government's

position, contained cocaine.

So Mr. Martinez was right in the mix.  He was going
down and purchasing cocaine for wholesale prices, prices that
were substantially discounted to the pricing that was
available, for example, here in Massachusetts.  He was
intercepted discussing the differential between that pricing,
the profit margin that they were able to make by going to
Puerto Rico and buying the cocaine there where they were
substantially closer to the ultimate source of supply.  The
pricing that they were receiving there indicated the proximity
to the South American suppliers; the fact that they were able
to purchase it for so much less than it was able to be sold for
and purchased for here in Massachusetts indicates the proximity
to the much higher level suppliers who were much closer to the
ultimate South American suppliers.

Mr. Martinez, as I said, also participated in the
distribution of the drugs here.  He had his own customer base
here.  He was intercepted speaking with customers, attempting
to sell the cocaine after it arrived here in Massachusetts,
offering cocaine to customers of his own, speaking with his
brother about the fact that he had people who were interested
in buying cocaine.

He also was intercepted talking to people about brown,
about F, which those were all references to fentanyl.  So
there's indication that he was not only distributing cocaine

1     but he also was distributing fentanyl as well.

2          Mr. Martinez also was intercepted talking about

3     firearms.  He was a person that this associate Bebe went to

4     when he was looking for buyers for guns.  So we have

12:46  5     intercepted calls where Bebe --

6          THE COURT:  He's Bebe, right?

7          MS. FERGUSON:  He's Bebo -- it's confusing -- but he

8     has an associate Bebe who calls him and says, I have guns and

9     I'm looking for buyers for them.  Can you help me find buyers.

12:46 10     I have a 22, I have a 9, I have a Glock, I have a Glock with an

11     extended slide.  It costs this much money.  I'm looking for

12     somebody to buy it.

13          And Mr. Martinez says, okay, I'll let you know.  Okay,

14     I might have somebody.  I'll let you know.  So he is somebody

12:46 15     who people approach when they want to find a buyer for guns.

16     He's also somebody who his brothers make reference to having a

17     gun.  There's a call in the PSR that discusses his brothers

18     talking about going to confront associates with whom they're

19     having a disagreement.  They're unhappy.  They're having a

12:47 20     disagreement with somebody.  They make arrangements, make plans

21     to go confront these other people.  They talk about how they

22     have guns, they're going to take guns with them.  This can't

23     continue.  Do you have -- do you still -- do you have your guns

24     still.  Do you have ammunition for the gun.  Yes, I have a

12:47 25     clip.  I have a clip that holds 40 bullets.  That's plenty.

1    We'll be good.  And Bebo, who is this defendant, has his, too.

2    He got one yesterday, he brought one yesterday, and he's going

3    to bring his also.

4         So there's also a reference to this defendant,

12:47  5    Mr. Martinez, having a gun, taking a gun to this confrontation

6    where they're going to meet up with someone else with whom they

7    are having this disagreement, and law enforcement did intervene

8    in that instance because there was concern about possible

9    violence.

12:48 10         So there is reference here to guns, to violence, and

11    that is clearly concerning.

12         THE COURT:  You said law enforcement intervened, is

13    that at the time of the arrest or are you talking about some

14    other --

12:48 15         MS. FERGUSON:  That was earlier.  That was during the

16    summer before the arrest, and they took some steps to try to

17    prevent any confrontation from happening.

18         THE COURT:  Okay.

19         MS. FERGUSON:  They did not intervene with

12:48 20    Mr. Martinez specifically, but they did take -- they just took

21    some steps to try to prevent any confrontation.

22         When law enforcement did make arrests on December

23    15th, 2021, they entered into the residence in Puerto Rico

24    where Mr. Martinez and his brother Joseph Correa had recently

12:49 25    arrived that morning, very early that morning, and they found

1    Mr. Correa in that residence, in the living room of that

2    residence.

3         He was holding a gun in his hand.  It was a gun that

4    had been converted into a fully automatic weapon, and they did

12:49  5    locate additional ammunition in the bedroom that was occupied

6    by Mr. Martinez.  So again, the presence of firearms.  They

7    were there -- it is the government's position they were there

8    in Puerto Rico again to purchase cocaine, presence of firearms

9    in connection with the drug activity.  Obviously, very

12:49 10    concerning in and of itself, but the presence of an automatic

11    firearm is just all the more concerning, all the more

12    disturbing, really.

13         And the fact that Mr. Martinez and his brothers were

14    not only contributing to the destruction of communities through

12:50 15    drug dealing but also through this perpetuation of the violence

16    attendant to drug dealing, the firearms and the gun violence

17    attendant to drug dealing, both here in Massachusetts but also

18    in Puerto Rico, is a factor also that goes into the

19    government's sentencing recommendation and that the government

12:50 20    feels should be incorporated into the government's -- the

21    Court's fashioning of Mr. Martinez's sentence.

22         And ultimately, and so importantly, the government has

23    considered, and urges the Court to consider, the fact that

24    Mr. Martinez's behavior in this case is not aberrant.

12:51 25    Mr. Martinez is someone who is a multi-time repeat offender.

1    His criminal behavior seems to not have abated over time but

2    rather to have escalated over time.

3            THE COURT:  Are you referring to the two predicates

4    that we discussed or are you referring to more than that?

12:51 5          MS. FERGUSON:  He has the two predicates, and he does

6    also have, I believe, another drug conviction that does not

7    score.

8            THE COURT:  Is that the continuance without a finding

9    at age 17?

12:51 10         MS. FERGUSON:  Because of his age, he -- yes.

11           THE COURT:  So that was, just for the record, 2011.

12   But the two that are predicates are 2016, both of those, and

13   they are just a few months apart, right?  And he got a

14   concurrent sentence of two years -- two to three years on one

12:52 15   count?

16           MS. FERGUSON:  He got a sentence of two to three years

17   on the trafficking count and two years on the firearms count,

18   the -- the firearms count, and then he got a six-month sentence

19   on a distribution of Class B count.

12:52 20         THE COURT:  All right.  So total time incarceration

21   was roughly what?  The firearm, was that consecutive or

22   concurrent?  So two to three years committed to state prison?

23           MS. FERGUSON:  It's concurrent.

24           THE COURT:  Okay.  So two to three years is the max?

12:52 25         MS. FERGUSON:  Yes.  I don't know what he actually

1    served on it, but two to three years.

2        THE COURT:  So that's the more appropriate question.

3    So he was sentenced back in 2016 at the age of 22 for two to

4    three years.  Both of those drug offenses that are the

12:52  5    predicate for this career offender all happened within roughly

6    eight months of each other, and so he got a concurrent

7    sentence.  So I understand what the state court did.  All

8    right, so.

9        MS. FERGUSON:  I mean, yes.  I don't know when he

12:53 10    actually went into custody, but if he served close to the three

11    years and got out at some point in 2019, yes, and then this

12    case was 2021.

13        THE COURT:  Okay.  But there's nothing else that I'm

14    missing, right?

12:53 15        MS. FERGUSON:  2011, and two offenses in 2016.

16        THE COURT:  Got it.

17        MS. FERGUSON:  So he is -- he has three prior drug

18    convictions.  He has --

19        THE COURT:  Well, that's a continuance without a

12:53 20    finding.  So that ultimately gets dismissed if he --

21        MS. FERGUSON:  Yes, it includes an admission.

22        THE COURT:  Yeah, okay.

23        MS. FERGUSON:  And for federal purposes, it does count

24    as a conviction if it had not been -- if it did not time out,

12:54 25    if his criminal history had not been so lengthy, it would have

1    qualified --

2              THE COURT:  Got it.

3              MS. FERGUSON:  -- and he would have received points

4    for it.

12:54  5         He has a prior firearms conviction on which he did

6    receive two years in state prison.

7              THE COURT:  That's the same one we've just talked

8    about?

9              MS. FERGUSON:  Yes.

12:54 10            THE COURT:  Okay.  The trafficking.

11             MS. FERGUSON:  Yes.

12             And as I just mentioned, he does have the prior drug

13   possession, which initially was a school zone case, that timed

14   out because he has been drug involved for such a lengthy period

12:54 15   of time.

16             So given all of these factors, it's somewhat difficult

17   for the government to see how a sentence at or below the low

18   end of Mr. Martinez's natural GSR would be appropriate in this

19   case.

12:55 20            THE COURT:  All right.  So you don't want me to go any

21   lower than 108, but you're still at 141?

22             MS. FERGUSON:  Yes.

23             THE COURT:  Okay.  I'm following you.

24             MS. FERGUSON:  And in terms of the sentence

12:55 25   recommended by the defendant, the mandatory minimum sentence,

```
      1   60 months --
      2            THE COURT:  You don't have to address that.
      3            MS. FERGUSON:  Okay.
      4            THE COURT:  Let's hear your support.
12:55 5            MS. FERGUSON:  Even a sentence somewhat above that or
      6   in the middle of the range that the Court had previously
      7   mentioned today in its remarks, we have -- the highest sentence
      8   that's been imposed so far in this case is Alberto Gonzalez
      9   [sic], who received a sentence of 72 months from the Court.
12:56 10           THE COURT:  So tell me how he's different.  Thank you.
      11           MS. FERGUSON:  Mr. Gonzalez is, in the government's
      12  view, far less culpable than Mr. Martinez.  Mr. Gonzalez was
      13  working --
      14           THE COURT:  What did you say I gave him?
12:56 15           U.S. PROBATION:  Do you mean Marrero?
      16           MS. FERGUSON:  I'm sorry.  Albert Marrero.
      17           THE COURT:  I do see 72 months.  And 2,600 converted
      18  drug weight.
      19           MS. FERGUSON:  Sorry about that.  Yes.  So he was
12:56 20  working --
      21           THE COURT:  He's Criminal History Category I.
      22           MS. FERGUSON:  He was working at a stash house.  He
      23  distributed drugs essentially with/for Mr. Correa, Joseph
      24  Correa.  He operated the stash house.  He received the drugs
12:56 25  from Correa.  He had discretion.  He had the customer phone.
```

        He communicated directly with the customers.  He took the
        orders from the customers.  He distributed the drugs to them.
        He contacted Correa when he needed to receive more drugs, and
        Correa would arrange essentially for the drugs to be delivered
12:57   to him at the stash house, and he would receive the drugs.  And
        he was distributing fentanyl and cocaine essentially to retail
        customers from his residence.
                THE COURT:  And his was fentanyl, cocaine, and crack.
                MS. FERGUSON:  Yes.  As I said, basically in retail
12:57   amounts out of his residence.  He did not participate really in
        obtaining the drugs from the suppliers.  I believe maybe there
        was reference possibly one time to him meeting with the
        fentanyl supplier when Correa was going to be in Puerto Rico,
        but he didn't really have a relationship with the suppliers.
12:57           He was not like Mr. Martinez, who, as I said, was
        traveling to Puerto Rico to obtain the cocaine, was investing
        his own money in the cocaine, was profiting directly from the
        sales of the cocaine to the customers here, discussing the
        prices paid for the cocaine to the suppliers, discussing the
12:58   profit margins, what the resale price was going to be, deciding
        what the retail price was going to be.  He did not have any of
        that type of input into the conduct of the business as it were.
        He did not do the type of travel that Mr. Martinez was doing.
        He just was not at the type of decision-making level that
12:58   Mr. Martinez was here.

1           There also was no indication at all of any sort of

2     involvement with firearms and the like when it came to

3     Mr. Marrero.  That was not at all present in the analysis with

4     respect to Mr. Marrero.  Mr. Marrero also, as you just

12:59  5     mentioned, was a Criminal History Category I.  His criminal

6     history was quite different from Mr. Martinez.  He did not have

7     prior drug crimes.  I know that was a point that we discussed

8     sort of extensively at his sentencing.

9           THE COURT:  Assault and battery.

12:59 10           MS. FERGUSON:  He did have some criminal history, but

11    he did not have a prior history with drug crimes and had not

12    served the type of committed time that Mr. Martinez has served

13    here.  He certainly did not qualify as a career offender the

14    way Mr. Martinez does here.  Even considering the Court's

12:59 15    comments about the career offender guidelines, I think still

16    the fact of having the predicates is important for comparison's

17    sake.

18           And so Mr. Marrero and Mr. Martinez just are not at

19    all similarly situated, and I think it is important that

01:00 20    Mr. Martinez's sentence reflect the fact that he is more

21    culpable than Mr. Marrero and that his personal history and

22    characteristics are very different from Mr. Marrero's.  And for

23    those reasons, I do think that his sentence should be more

24    significant from that imposed -- more significant than that

01:00 25    imposed on Mr. Marrero.

01:00

01:01

01:01

01:01

01:01

01:02

              So for all of those reasons, it is the government's
position that proportionality does dictate a sentence that is
quite a bit above the sentence that is recommended by the
defendant in this case, and the government does feel that a
sentence below the natural guideline range as calculated by the
Court for the defendant would not be appropriate in this case.
And as the government has recommended, the government does feel
that a sentence just a little bit above the natural guideline
range is appropriate here to reflect all of the 3553(a) factors
that the Court is required to consider in fashioning this
defendant's sentence.

              It's the government's position that a sentence of 141
months to be followed by four years of supervised release is a
sentence that is sufficient but not greater than necessary.
It's a sentence that will adequately punish Mr. Martinez for
his crimes.  It's a sentence that will promote respect for the
rule of law, that will send a message of specific and general
deterrence, and the government does respectfully request that
the Court impose that sentence.

              THE COURT:  Okay.  Thank you.  And I just want to
note, according to JSIN, their median number is 120 or 126
months.

              All right.  So you're going to tell me about all the
unique characteristics about him and why I should take that
into consideration to get this number lower.

1          MR. FULLER:  Your Honor, absolutely.  You know, we

2     talk about guidelines and we talk about calculations, about

3     weight and all these abstract things, and this is about a human

4     being, a person's life.  And we're talking about numbers, 100

01:02  5     and X months, these are years of somebody's life that we're

6     talking about.  And so when the Court said earlier this is one

7     of the hardest things to do, that you do, I couldn't agree

8     more, and I don't envy you.  And I kind of see, like, our job

9     is to make it really hard for you.

01:02 10          THE COURT:  And you do, both of you.

11          MR. FULLER:  So if we've done that and I -- actually,

12     I want to make it a little easier than the government would

13     suggest, but the idea that he should do double of what Marrero

14     got to me is outrageous, and I'll get back to that.

01:03 15          But the numbers are astronomical and totally out of

16     whack, as the Court said, especially given his criminal

17     history, which, as a former state court judge, you know

18     District Court cases are different than Superior Court cases.

19     CWOFs are different than guilty after trials.  He did less than

01:03 20     two years in state prison.  That's the most he's done.  It

21     shows up in the PSR when he got paroled.  So he's already done

22     more time in Wyatt than he's done in the state.  He's been 30

23     months in Wyatt, but I don't want to get ahead of myself.

24          So I want to talk about the nature and circumstances

01:03 25     of the offense, you know, his role in it.

01:03

1          First, to the extent I can touch and push back a
2    little bit on the government's narrative, and then I'm really
3    going to talk about who Mr. Martinez is.  And I know you've
4    read or hopefully have read his statement, and I'm not going to
5    read that to you, but I'm going to highlight some things in it.
6          But first of all, I mean, he's here -- he's pled
7    guilty a long time ago.  He's here to take responsibility for
8    what he did.  And all the things I'm about to say are not
9    excuses for what he did.  They're not justifications.  It's
01:04 10    just for you to understand the picture, including his role.
11          This isn't the Jose Martinez drug trafficking
12    organization.  That's not -- it's the Joseph Correa.  His name
13    is all over the complaint affidavit.  If you talk about Marrero
14    who got 72 months, and Ms. Ferguson talked about he reported to
01:04 15    Correa, he's not reporting to Jose Martinez.  He's not taking
16    direction from Jose Martinez.  Jose Martinez is the half
17    brother of Joseph Correa, and their mother was involved.  So
18    yes, he's there when the packages are shipped.  It's his
19    mother's house.
01:04 20          One of the most telling things frankly in the
21    government's brief, they talk about how he's responsible for
22    two of these packages.  This is at page 6 of their brief.  And
23    they quote from the wire about his involvement, but then the
24    last sentence says, "Ultimately the transaction did not occur
01:05 25    as Correa sold the drugs to a different customer."  This is the

1    theme throughout.  He has no control over any of this.  Yes, he

2    was involved, but Joseph Correa was the one who decided who

3    they sold to, for how much, when they were going to go to

4    Puerto Rico.  It's not Mr. Martinez, it's his brother, and he's

01:05  5    along with him for the ride, so to speak.  And I know the

6    government says he's not the top, but they're making him as if

7    he is the top.

8         And as far as the gun goes, and I understand the

9    government can -- and the burden is low on the reasonable

01:05  10   foreseeability that a firearm could be used, and that can be

11   attributed to all the co-conspirators, okay?  There's no

12   evidence whatsoever that he ever possessed a firearm.  They did

13   a search warrant on his house, no firearm.  A search warrant on

14   his car, no firearm.  He wasn't the one holding the gun at the

01:06  15   time of the arrest.  It was his brother.

16        Yes, there's discussion on the wire.  People involved

17   in this kind of business talking on the wire, do you take 100

18   percent to what they say is the truth, the God's honest truth?

19   I don't know what was this intervention that occurred.  It's

01:06  20   clear on the record that it didn't involve Mr. Martinez.  He

21   didn't possess a firearm.  Where is the firearm if he had it?

22   They arrested him in Puerto Rico.  Was it in his car?  There's

23   no firearm.

24        So yes, we understand he can be held accountable under

01:06  25   the guidelines, but that can be true for every single one of

1    these co-conspirators.  So it's sort of a selective

2    assignment --

3            THE COURT:  It's a little bit different for him

4    because he's right there in the home at the time with the gun.

01:06  5            MR. FULLER:  So is the mother, and I don't believe

6    she's getting tagged with the gun, and I'm not suggesting she

7    should.  And there's not a lot of cases -- anyway, I don't want

8    to talk about other cases.  But I just think applying the

9    enhancement selectively to certain defendants, including a

01:07 10    defendant who did possess a firearm and didn't get attributed

11    to it, Sonyi Rosario, I guess, had a firearm.

12            THE COURT:  A lawful.

13            MR. FULLER:  Well, some Second Amendment people don't

14    believe that there's any unlawful possession, but I'm not going

01:07 15    to go down that road here.

16            But Your Honor, my point is that there's a lot of like

17    essentially wanting to paint Mr. Martinez as if he's his

18    brother in this.  And he's number two in the indictment, but if

19    you look at all -- he's not controlling all these other

01:07 20    defendants.  To the extent there's a pyramid, he's sort of on

21    the outside.  His brother is at the top.  He's on the outside.

22    He's just there along for the ride.  He's not in control.  He's

23    not in charge.  So the role in the offense I think --

24            THE COURT:  How do you address the fact that in 2016

01:07 25    he gets convicted for two drug offenses and does time for

those, it happens to be concurrent, is released and is now

caught up in this?  At what point in time does life change for

him?

    MR. FULLER:  Does it change?

    THE COURT:  Yes.

    MR. FULLER:  I think, Your Honor, now you're touching

on I think in the last 30 months at Wyatt he's had a lot of

time to think about it.

    THE COURT:  I'm sure he had time to think about it

when he was in custody in Essex.

    MR. FULLER:  I'm sure he did, but I think there's a

difference between state custody where you've done two years

and now you're in federal custody and you're looking at

possibly ten and even more.  I think he's more mature now.

He's actually 30 years old.  He's not 29.  He's more mature

now.  He does have hopes and aspirations to get out and make

something of himself, and he has children.  One of the mothers

of his children is here today, Ms. Stephanie Vega is here.

    But again, to compare him to these other -- I know

Mr. Marrero didn't have any criminal history, but many of these

other defendants had long stretches.  They're much older.  He

still has the prospects of recovering from this whole thing and

making something of himself at 30 years old.  It's not going to

happen if he spends the next 14 years in prison.

    So one of the -- again, referring to Mr. Martinez's

background, you know, I think during the interview with

Probation when they asked about his childhood, he said he had a

good childhood, and then he proceeded to describe what,

frankly, most people would consider to be a nightmare.

01:09        Coming to the mainland from Puerto Rico at age 8, not

being able to speak English.  He's thrown into the public

schools in Lawrence.  He's getting picked on because his

English is poor.  There's racial slurs directed at him.  His

father is a heroin addict.  His mother -- eventually the family

01:09  broke apart because his mother had a relationship with another

man.  He didn't do well in school because of learning

disabilities.  It's -- I mean, to call that a good childhood --

there were times when the family didn't have enough food.

        So when you're raised in a house with a heroin addict

01:10  who -- as he details in his letter, you know, he witnessed him

putting together the bags to sell, when you grow up in that

environment, which I don't know many people or anyone who has,

it's not surprising that he would end up in this situation or

that his half brother or that his mother might be involved in

01:10  it.

        So I do think his circumstances that he's detailed in

his letter are substantially different than anybody else that

you sentenced here.  He does have -- you know, he doesn't have

skills in the sense of, you know, carpentry or things like

01:10  that, and he wants to work to get his GED.  But one thing I

1    think that you can discern from the PSR is that he is a hard

2    worker.  He got commended at Wyatt and also when he was in

3    state custody for his hard work in a couple of the programs.

4    And so I think there is hope for him.  There is hope if he --

01:11  5    he, also -- I don't want to forget this.  He was a regular

6    marijuana user every day basically from age 13 until he

7    probably was in custody, and there was some heroin use.  And he

8    would benefit from drug and alcohol rehab once he's committed,

9    Your Honor.  I want to make that request officially.

01:11 10        But -- so he's had the cards stacked against him from

11    day one.  He did have what -- I would not call it a significant

12    criminal history, although he is under the Court's ruling a

13    career offender under that definition, but two convictions, one

14    in District Court and one in Superior Court, at least in

01:11 15    defendants coming to this courthouse, that's not nearly as

16    substantial as many others have, but I'm not ignoring it.

17        But to go from having done two years in state prison

18    to 12 or 14 is excessive, unnecessary, overdeterrent, and

19    doesn't do justice to him as a human being who has potential in

01:12 20    this world, and when, in fact, I think our sentence of 60

21    months in light of his criminal history and in light of his

22    role in this offense and what the other defendants got --

23        THE COURT:  I understand why you recommended it based

24    on his personal life story, but I'm not sure that that number

01:12 25    adequately reflects his role and what that punishment should be

1    for his actions with regards to his criminal conduct.

2         MR. FULLER:  Well, I would like to disabuse you of

3    that, if I could, Your Honor.  And I don't know how, really,

4    how to say it except that he wasn't the leader and he's with

01:12    5    his brother who is the leader.  And I think it's punishing him.

6    In a sense he's involved, yes, but he's with his brother.  If

7    he were the brother of one of the lower level people, he would

8    have been doing the same thing.  So it's not his idea.  It's

9    not his drug trafficking organization.  It's the Correa DTO.

01:13   10         So I understand the Court's concern, but I think his

11    involvement is overstated by the government.  And if you look

12    at, again, the complaint affidavit, which is in the docket, of

13    course you probably read it some time ago, his name appears

14    sparingly because he's really not the one directing all these

01:13   15    other people.  It's not him.  It's his brother.  And he's on

16    the wire because it's his brother, and he's talking and he is a

17    part of it, but he's not directing it, he's not calling the

18    shots.  And I just -- that's the difference.  And I guess if

19    Mr. Correa does go to trial, it will come out at trial, and

01:13   20    that will be evident.

21         Again, he's not saying he wasn't in the conspiracy.

22    He clearly was.  That's not the issue.  It's is he deserving of

23    the harshest punishment thus far meted out by this Court, and I

24    don't believe the record supports it.  And understanding the,

01:14   25    you know, the out-of-whack guidelines that are driven by the

weight, which, again, is a shame because without the career

offender, without the gun enhancement, the low level of the

guideline would be closer to what we were asking for and it

wouldn't seem so unreasonable.  But once the guidelines jack up

01:14  these months, then it becomes less reasonable, and that's

really, I think, one of the big problems with the guidelines.

But Your Honor, I really think -- you know, his

personal statement does I think set out who he is as a person,

and that, you know, he will have a semblance of a life if he

01:14  does 60 months, but the government's recommendation is really,

I think, cynical and just beyond what really is necessary and

draconian.

That's really all I have to say.  I'm happy to answer

any questions.

01:15  THE COURT:  No, I don't think I have any questions.

Mr. Martinez, I know you submitted a letter.  If you want to

speak, you can, but I've read that, so.  Did you want to say

something?

THE DEFENDANT:  No, Your Honor.

01:16  THE COURT:  I think I -- okay.

In consideration of what a reasonable sentence would

be here, I must consider and have considered all of the

factors.  That includes the nature and circumstances of the

offense, defendant's personal and criminal history, relevant

01:17  characteristics, kinds of sentences available, kinds of

sentence and sentencing range established for the category of
offense committed by the category of defendant, any pertinent
policy statement issued by the sentencing commission, the need
to avoid unwarranted sentence disparities among similarly
situated defendants, and the need to provide restitution to any
victims, if there are any, but that's not applicable here.

I've also considered the need for the sentence imposed
to reflect the seriousness of the offense, to promote respect
for the law, and to provide just punishment, to afford adequate
deterrence to criminal conduct, and to protect the public from
further crimes of the defendant, and to provide the defendant
with any needed education or vocational training and treatment.

Before I may impose a variance, I must follow a
three-step process that the Supreme Court established in *Gall
v. United States*.

First, I must calculate the guidelines, as I've done.

Second, I must determine whether to apply any
guideline departure policy statements to adjust the guideline
range.  I have reviewed each of these policy statements and
found that none precisely fit the individual needs that this
case presents.

Third, I must consider all of the sentencing factors
in Section 3553(a) which I listed few moments ago.  I've
considered each of those factors in deciding whether to impose
a variance.

1        The First Circuit has repeatedly held that I should

2   give particular consideration to the nature and circumstances

3   of the offense and of the offender, and I've considered those.

4   We've talked about those.  The crime here can't be understated

01:19  5   as a serious offense and the harm that it causes the community.

6        I've heard the arguments about Mr. Martinez's role in

7   this diagram or overall scheme.  He is not Mr. Correa.  He is

8   his brother.  He certainly was at the heart of things in the

9   sense that he was there at the time, certainly aware and

01:20 10   involved and I agree to a greater extent than other defendants.

11   I have taken into consideration his age, taken into

12   consideration his prior history, which certainly occurred at

13   a -- within a short window of time, two offenses within a short

14   period of time, eight months, in 2016.  That apparently wasn't

01:20 15   enough to change his conduct because he, once released from

16   state prison, he followed his brother and family members and

17   got involved with this conspiracy.

18        What I've also taken into consideration is his

19   statement that describes his upbringing, and it's really not a

01:21 20   surprise that that's how he ended up engaging in this conduct

21   because he didn't learn any different from his family, from his

22   parents.  It's not an excuse, it's not the justification, but

23   it does help me understand why you made bad decisions.  And

24   clearly you made mistakes.  You used poor judgment and did bad

01:22 25   things.  So all of that I have to punish for, but I'm also

1    required to be optimistic about your future in giving you an

2    opportunity to redirect your life.  I don't know if this is

3    going to do it.  I can only hope that it will.  So what I've

4    decided would be an appropriate sentence -- why don't you

01:22    5    stand.  I'll just go ahead and impose sentence.

6            And the last thing I want to comment on is that I've

7    taken into consideration the other defendants in here, and I

8    agree with the government, that there should be some

9    proportionality in comparing you to Mr. Marrero and the others.

01:23    10    I've determined that you do warrant a sentence that is greater

11    than his.  It's not the five years that you were looking for,

12    nor is it the 141 months that the government was looking for.

13    The natural guidelines that have been referred to of 108 to 135

14    months, it's not that either.  So I'm varying downward of that.

01:24    15            Considering that you have, you know, according to your

16    attorney, spent two years in state prison but had a sentence up

17    to three, and I understand that you've already been at Wyatt

18    for 30 months, but I've determined pursuant to the Sentencing

19    Reform Act of 1984 and having considered the sentencing factors

01:24    20    enumerated in 18 U.S.C. Section 3553, it is the judgment of the

21    Court that the defendant is hereby committed to the custody of

22    the Bureau of Prisons to be imprisoned for a term of 90 months,

23    and I calculate that, you know, the number's real hard to

24    figure out what that means in years, but I count that as seven

01:25    25    and a half years, which I think is a substantial amount of time

1    in anyone's life.

2          So government, what was your recommendation for a

3    supervised release period?

4          MS. FERGUSON:  Four years.

01:25  5          THE COURT:  I will impose the four years of supervised

6    release, standard and mandatory conditions, but also include

7    the recommendation by counsel for the RDAP program, which I

8    believe you're eligible for, no fine because I don't believe

9    you have the ability to pay a fine, and a $100 special

01:26 10   assessment.  Is there forfeiture?

11         MS. FERGUSON:  I do not believe there's been any

12   preliminary motion for forfeiture filed --

13         THE COURT:  Okay.

14         MS. FERGUSON:  -- preliminary order for forfeiture.

01:26 15         THE COURT:  And I'm just checking to see if there's

16   any additional special conditions that I need to include.

17         So that also -- your special conditions include:  Must

18   submit to substance use testing not to exceed 100 drug tests

19   per year; that's number one.

01:26 20         And anything further from Probation?

21         U.S. PROBATION:  No, Your Honor.  Just compliance with

22   the mandatory conditions and the standard conditions of

23   supervision.

24         THE COURT:  Yes.  And those are outlined on page 42 of

01:27 25   the presentence report.  Mr. Lara will give the appellate

1  rights.

2          THE CLERK:  Yes, Your Honor.  Sir, the Court hereby

3  notifies you of your right to appeal the sentence.  If you

4  cannot afford the costs of an appeal, you may move to proceed

01:27  5  in forma pauperis.  Any appeal from the sentence must be filed

6  within 14 days of entry of judgment.  Do you understand these

7  rights?

8          THE DEFENDANT:  Yes, I do.

9          THE CLERK:  Thank you.

01:27 10          THE COURT:  Government, is there anything?

11          MS. FERGUSON:  No, not from the government.

12          THE COURT:  Counsel?

13          MR. NOONAN:  Your Honor, only that -- we know it can

14  only be a recommendation -- if the Court could recommend to the

01:27 15  Bureau of Prisons that Mr. Gonzalez [sic] be kept somewhere

16  close to the New England area.

17          MR. FULLER:  Martinez.

18          THE COURT:  And the RDAP is just a recommendation as

19  well; is that right?

01:27 20          MR. NOONAN:  You can only make a recommendation,

21  that's correct, Your Honor.

22          THE COURT:  I'll make those recommendations.  Anything

23  else?

24          MR. NOONAN:  No, Your Honor.

01:28 25          THE COURT:  Mr. Martinez, like I said, I don't know if

this changes your behavior.  I hope it does.  It looks like
you've got people in the back who care for you.  But you're
only going to end up back here, and other people are only going
to get hurt, so please reflect on that and make better
decisions in your life.  You're still young.  All right.  Good
luck to you, sir.

THE DEFENDANT:  Thank you.

THE CLERK:  We're adjourned.

(Adjourned at 1:28 p.m.)

1                CERTIFICATE OF OFFICIAL REPORTER

2

3             I, Linda Walsh, Registered Professional Reporter

4   and Certified Realtime Reporter, in and for the United States

5   District Court for the District of Massachusetts, do hereby

6   certify that the foregoing transcript is a true and correct

7   transcript of the stenographically reported proceedings held in

8   the above-entitled matter, to the best of my skill and ability.

9             Dated this 3rd day of June, 2024.

10

11

12          /s/ Linda Walsh

13          Linda Walsh, RPR, CRR

14          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25